UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

v.                                              Case No. 8:14-cr-496-T-17AEP

ROBERT WILLIAM BARTON,

    Defendant.
_____/

## REPORT AND RECOMMENDATION

This MATTER is before the Court on Defendant Robert William Barton's ("Defendant") Motion to Exclude DNA Evidence and Testimony ("Motion") (Dkt. No. 67), which was referred to the undersigned by the Honorable Elizabeth A. Kovachevich for a Report and Recommendation. The United States filed a Response in Opposition to Defendant's Motion to Exclude DNA Evidence (Dkt. No. 71), and the Court conducted a *Daubert* hearing on the matter on August 25, 2016 and September 7, 2016, during which Candy Zuleger, MS ("Zuleger"), Laboratory Director at Trinity DNA Solutions ("Trinity"), testified on behalf of the United States, and Dr. Elizabeth Johnson, Ph.D, ("Johnson") testified on behalf of Defendant.[1]

---

[1] Both Johnson and Zuleger have also submitted affidavits for the Court's consideration. *See* Dkt. No. 67, Attachment 2 ("Johnson's Affidavit"), and Dkt. No. 71, Exhibit A ("Zuleger's Affidavit"). Additionally, it must be noted that the parties agree that both Johnson and Zuleger are qualified as experts on the subject matter of DNA testing. *See* generally, Dkt. No. 67, Attachment 2 at 11 ("Johnson's Resume"), and Dkt. No. 71, Exhibit A at 6 "(Zuleger's Curriculum Vitae").

By his motion, Defendant asserts that, pursuant to Federal Rules of Evidence 402, 403, 702, and 901(b)(9), and the Fifth, Sixth, and Eighth Amendments to the United States Constitution, any of Zuleger's DNA testing results, as well as any corresponding expert testimony, should be deemed inadmissible as it is unreliable and not based on sufficient facts or data as required by *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and *Khumo Tire Co. v. Carmichael*, 526 U.S. 137 (1999).  In response, the United States asserts that the testing performed by Trinity was routine and reliable, using a process that involved well-accepted techniques and methodologies, and, as such, Defendant's arguments should go solely to the weight of the evidence rather than the admissibility of the evidence.   For the following reasons, the undersigned recommends that the Court find that the disputed DNA test results satisfy the standards set forth in *Daubert* and under Rule 702[2], and allow the admissibility of the disputed DNA evidence.

## I. Background

To fully understand the Defendant's arguments in his Motion, a brief explanation of DNA is necessary.  As succinctly explained by the United States:

> Within a typical human cell, DNA is wrapped tightly into forty-six chromosomes – often discussed as pairs of twenty-three. Physical locations on one chromosome correspond with physical locations on the other paired chromosome.  One location may specify that a person have brown eyes, the other corresponding location may specify blue. Or, both locations may specify blue, or both brown.  How those genetic locations interact with each other ultimately determines your eye color. The important takeaway is that for each location on a chromosome that influences an attribute, there is a related location on its paired chromosome that also influences the

---

[2] Although Defendant also moved pursuant Federal Rules of Evidence 402, 403, and 901(b)(9) that the disputed DNA evidence be deemed inadmissible, Defendant made no argument under those Rules of Evidence.  Thus, the Court will only consider Defendant's Motion under the standards set forth in *Daubert* and under Rule 702.

2

> attribute. The DNA found at one of those locations is called an "allele," and alleles, like chromosomes, come in pairs.
>
> Scientists have determined that certain alleles are highly variable between individuals. They have also determined the statistical probability of finding those alleles in the greater population. Thus, when a profile of alleles from a known person matches a profile of alleles from an unknown DNA sample, statistical analysis can give us insight into how likely it is that the known person is the source of the unknown DNA.
>
> A simplified example makes the point. Scientists know Joe Smith has a certain DNA profile. At locus 1, he has alleles A and B. At locus 2, he has alleles C and D. At locus 3, he has an unknown allele and E. Scientists also know that in the general population of men, 5% have the combination of A and B alleles at locus 1; 10% of men have the combination of C and D at locus 2, and 50% of men have the combination of a random allele and E at locus 3.
>
> Simple math explains how likely it is to find a person just like Joe in the general population of men. You multiply the percentages together: .05 x .10 x .50 = .00025 or .025% of the general population has the same genetic makeup as Joe Smith at those three loci.
>
> The math gets more complicated in the real world, but the concept remains the same. If you know the frequency of certain alleles appearing at certain locations, and those alleles match a known suspect, you can calculate how likely it is that the allele came from the suspect or from someone in the general population.

Dkt. No. 71 at 2-3 (citations and illustrative chart omitted).

Here, a DNA sample obtained from Defendant was compared to an unknown DNA sample collected from a firearm that was seized by law enforcement from a vehicle occupied by Defendant, and others.[3] Zuleger, in her capacity at Trinity, was provided both Defendant's known DNA sample and the unknown sample collected from the firearm, and tasked with

---

[3] *See* Dkt. No. 54 for a full a factual background of this case.

testing and ultimately comparing the samples. As for Defendant's known DNA sample, as partially displayed below[4], alleles, most often allele pairs[5], are designated for each locus.

| Sample Name | Amel | D3S1358 | D1S1656 | D2S441 | D10S1248 | D13S317 |
|---|---|---|---|---|---|---|
| 15-00766 Robert Barton standard | X, Y | 15, 16 | 16, 17.3 | 10, 15 | 13, 16 | 8, 12 |

Allele Designations / Location Designations

In order to determine that Defendant's DNA is consistent with the unknown DNA sample collected from the firearm, Zuleger compared the alleles found in a particular locus from Defendant's known DNA with the alleles found at the same locus from the unknown DNA collected from the firearm. *See generally* Govt. Ex. #3. Significantly, Defendant does not dispute or take any issue with Zuleger's testing on Defendant's known DNA sample. Rather, Defendant solely challenges Zuleger's testing and interpretation on the unknown DNA sample collected from the firearm.

## II. Factual Findings

Trinity is accredited by ANAB, a national accreditation board, formerly of Forensic Quality Services International, which is the longest established provider of accreditation to forensic laboratories in the United States. Trinity's accreditation was based in part on its compliance with ISO 17025, which is a set of standards relating to management and technical requirements to professional laboratories. The accreditation was also partially based on its

---

[4] *See* Govt. Ex. #3 for a full display of Defendant's DNA profile as tested from Defendant's known sample.

[5] Typically, based on a single donor DNA sample, two alleles are present at a locus, that is allele pairs, because one allele is received from each parent. However, it is possible to have just one allele present at a locus, known as homozygous, which occurs when there is the presence of two identical alleles at the same locus.

compliance with the FBI Quality Audit Standards, which is made up of standards related to DNA analysis, practices, and performances. In connection with the accreditation, Trinity is required to undergo external auditing of its DNA testing procedures and methodologies every two years. During accreditation, and at that time of any audit, auditors review Trinity's Forensic Biology Procedures Manual ("Manual"). *See* Govt. Ex. #1. The Manual, which has an effective date of December 23, 2015, was utilized to perform the disputed testing. *Id.* The Manual was reviewed and approved by auditors during the accreditation process.

A DNA kit was used for testing the DNA in this case. The DNA kit utilized was PowerPlex Fusion. Zuleger utilized standard and accepted steps in testing the DNA in this case: (1) collection of the sample; (2) extraction of DNA from the sample; (3) quantitation of the amount of DNA extracted from the sample; (4) amplification of the DNA; and (5) profile analysis of the DNA. The quantitation and amplification steps are most relevant to Defendant's attack upon the admissibility of the DNA testing in this case.

At the quantitation step, the amount of DNA identified by Zuleger from the collected unknown sample from the firearm was estimated to be 210 picograms ("pg"). Although the optimal amount of DNA for testing is approximately 500 pg, the measurement of quantitation is only an estimate, as exemplified by the fact that full DNA profiles have been tested by Trinity and other labs in samples where the quantification number was almost zero picograms. However, when there is a small amount of DNA quantified and analyzed then there is a heightened potential for "stochastic effects." Stochastic effects associated with testing a small sample size include, allele drop-out (when one or both allelic copies at a locus fail to be amplified by the polymerase chain reaction), allele drop-in (contamination with extraneous alleles, either at the point of recovery of a sample or during laboratory analysis of the sample),

5

peak height imbalance (inconsistent peak heights for the true alleles, which may result in extraneous alleles at some loci that produce higher peaks than true alleles), and stutter (when the DNA is replicated, some of the alleles may become altered, creating a small amount of a different allele that is then detected in the analysis of the sample, thereby potentially creating a false allele in the resulting DNA profile that does not correspond to the donor's true DNA profile).

At the amplification step, Zuleger utilized Polymerase Chain Reaction/Short Tandem Repeat testing ("PCR-STR"), which is where the DNA goes through a fixed standard amount of cycles, 30 cycles, to produce data to be analyzed by a genetic analyzer and displayed on an electropherogram.[6] As displayed in the electropherogram generated by Zuleger's testing of the unknown DNA sample, collected from the firearm, allele data was present at twenty different loci.[7] *See* Govt. Ex. #5.  Unlike Defendant's known sample, where there is the presence of no more than two alleles at any loci, the data generated from the unknown DNA sample produced the presence of three or more alleles at specific loci.  *See e.g.*, Govt. Ex. #5 (displaying alleles 11, 12, 14, 16 & 17.3 at loci D1S1656).  Significantly, the presence of five or more alleles at any loci generally indicates that three or more individuals are donors to the collected DNA sample. Thus, the unknown DNA sample collected from the firearm was identified as a mixture of three or more donors.

---

[6] Notably, Defendant does not dispute that the PCR-STR method of DNA testing has been accepted by the vast majority of courts and is generally accepted by the scientific community. *See* Dkt. No. 67, 8-9 (citing *US. v. Gaines*, 979 F. Supp. 1429, 1441 (S.D. Fla. 1997); *Simmons v. Sec'y, Dep 't of Corr.*, 2010 WL 1408434, at *8 (M.D. Fla. Apr. 6, 2010)).
[7] It should be noted that Zuleger only utilized data from 10 loci for her statistical calculation, which resulted in a more conservative calculation.

Trinity maintains procedures in its Manual to address mixture samples. Specifically, the Manual states that:

> [a] sample may be considered to consist of a mixture of major and minor contributors if there is a distinct contrast in signal intensities among the alleles. The difference is evaluated on a per sample basis and all loci should be evaluated in making this determination. It is possible that the major or minor contributor may only be able to be determined at some of the loci. Often it is possible to determine the major contributor but not be able to discern the minor contributor. A major contributor may be determined even when more than two contributors are present if the major donor allele peaks are at a much higher intensity then the multiple minor donor alleles.

Govt. Ex. #1 at 99.

Trinity also performed validation studies on the PowerPlex Fusion kit. The validation studies were peer reviewed and approved, and conducted to well-known and accepted standards. *See* Def. Ex. #3. Notably, the validation studies were done with known DNA samples so that the results of the studies could be verified. In connection with that process, the validation studies examined the sensitivity of the PowerPlex Fusion kit. *See id.* at 4-10. Specifically, the validation studies concluded that:

> [i]t is expected that target amp concentrations . . . down to approximately 0.2ng, also have the capability to obtain full or nearly full profiles. In fact, if a sample is suspected to be of sufficient quantity/quality (i.e. standards or uninhibited dried stain samples) it may be preferred to lower the target concentration to approximately 0.25ng as 0.5ng may result in too high RFU values. One of the advantages of the increased number of loci with this kit is that a partial profile (i.e. 17 loci) can actually be of higher discrimination potential than a full Identifiler Plus profile (l5 loci). Therefore, even significantly lower quant values can generate sufficient allele data statistical significance.

*Id.* at 8. Trinity also performed testing with the PowerPlex Fusion kit on mixture samples containing two known DNA donors. *See id.* at 9-16 (also discussing an analyst's responsibility

to understand the types of artifacts to expect and interpret).  The goal of the mixture tests was to determine whether the PowerPlex Fusion kit could accurately ascertain the DNA profile of a ''major donor,'' that is the donor with the larger percentage of DNA in the tested sample. The mixture assessments included mixture ratios of 1:1, 1:2, 1:5, 1:10, and 1:20 between the two known DNA donors.  *See id.* at 9.  In addition to the sensitivity and mixture studies, Trinity also tested the PowerPlex kit with 30 mock or non-probative evidence samples, including trace/low level, inhibited, degraded, aged, previously processed, sexual assault, firearm, drugs or other unusual evidence, and concluded that the PowerPlex Fusion kit performed impressively for a variety of the sample types tested.  *See id.* at 9-10.

Based on the results of the validation studies, Trinity created interpretation guidelines for data results obtained when testing DNA with the PowerPlex Fusion kit.  For example, in order to determine a genotype, the guidelines from the validation studies require that allele peak heights be above a stochastic threshold level of 400 RFU (*see id.* at 19-24), and that the sister alleles' peak heights be within 60% of each other.  *See e.g.*, Govt. Ex. #5 (demonstrating at locus D3S1358 allele 15 with a peak height of 416 RFU and allele 16 with a peak height of 516 RFU).  The 400 RFU threshold is significant because anything below that level is where there is a heightened concern for stochastic effects, such as allele drop-out.  The 60% threshold is significant because anything less would raise peak imbalance considerations.  The analytical threshold is 50 RFU (*see* Def. Ex. #3 at 16-19), which is the threshold that must be met in order to consider the data as an allele.  *See e.g.,*  Govt. Ex. #5 (displaying at locus D#S1358 allele 17's peak height at 158 RFU, which is below the stochastic threshold but above the analytical threshold). The interpretation guidelines memorialized from the PowerPlex Fusion validation studies (Def. Ex. #3), along with the policies and procedures as outlined in Trinity's Manual

(Gov. Ex. #1) were relied upon by Zuleger to interpret the data from the unknown DNA sample collected from the firearm to identify and opine a major donor for the unknown sample.

### III. Legal Standard

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony and provides that if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.  Fed. R. Evid. 702; *McCorvey v. Baxter Healthcare Corp*., 298 F.3d 1253, 1257 (11th Cir. 2002).  Simply stated, the trial court can admit relevant expert testimony only if it finds that: "(1) the expert is qualified to testify about the matters he/she intends to address; (2) the methodology used by the expert to reach his/her conclusions is sufficiently reliable . . . ; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or determine a fact in issue." *Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cnty., Fla*., 402 F.3d 1092, 1107 (11th Cir. 2005) (citing *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004). The party offering the expert bears the burden of establishing qualification, reliability, and helpfulness. *Id.*

In *Daubert*, the Supreme Court made clear that Rule 702 assigns to the district judge "the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand."  509 U.S. at 597.  The burden is on the party proffering an expert to show that the expert testimony is admissible.  *McCorvey*, 298 F.3d at 1256.  "Further, it is

not the role of the district court to make ultimate conclusions as to the persuasiveness of the proffered evidence. Quite the contrary, vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence. Indeed, in most cases, objections to the inadequacies of a study are more appropriately considered an objection going to the weight of the evidence rather than its admissibility." *Rosenfeld v. Oceania Cruises, Inc.*, 654 F.3d 1190, 1994 (11th Cir. 2011) (internal citations and quotation marks omitted). Notably, the "failure to include variables will affect the analysis' probativeness, not its admissibility." *Quiet Tech. DC–8, Inc. v. Hurel–Dubois UK Ltd.*, 326 F.3d 1333, 1345 (11th Cir.2003) (quoting *Bazemore v. Friday*, 478 U.S. 385, 400 (1986)).

### IV. Analysis[8]

In this case Zuleger opined from her testing: (1) a profile of Defendant's DNA from the known sample collected from Defendant; (2) a profile of a major donor of the unknown DNA sample collected from the firearm, which sample consisted of at least three donors; (3) that Defendant's known DNA profile is consistent with the major donor's profile identified from the unknown DNA sample (*see generally* Govt. Ex. #3); and (4) the major donor's profile identified from the unknown DNA statistically would occur once out of every forty-one million people. To formulate her opinion, Zuleger relied upon Trinity's audited procedures, which specifically allow that major and minor donors to a mixed sample can be determined after examining all loci, and finding a "distinct contrast in signal intensities among the alleles." Govt. Ex. 1 at 99. Signal intensities or peak heights reflect how much of

---

[8] To the extent that any of the following conclusions of law may represent findings of fact, the Court adopts them as such.

one allele or another is present in a sample.  Trinity's procedures requires an analyst to examine all of the locations in a given sample before determining whether a major donor can be identified.  *See id.*  Notably, major or minor donor analysis is not limited to mixtures of only two individuals, so long as the "major donor peaks are at a much higher intensity then the multiple minor donor alleles." *Id*.

Defendant's arguments focus solely on Zuleger's testing on the unknown DNA collected from the firearm.  In sum, Defendant asserts that the testing on the unknown DNA sample collected from the firearm is inadmissible because the testing on the small amount of DNA collected from at least three donors resulted in unreliable results.  Defendant suggests that this type of testing is known as low copy number ("LCN") testing, which Defendant states is the analysis of any DNA where the resulting data is below stochastic threshold levels for reliable interpretation.  (Dkt. No. 67 at 2.)  Further, Defendant claims that testing on LCN DNA, "especially a DNA sample with multiple donors, [will result in] exaggerated stochastic sampling effects . . . , including allele drop-in and drop-out, elevated stutter, and peak height imbalance which makes it extremely difficult to interpret results that can be considered reliable." *Id.*[9]  In support of his position, Defendant relies exclusively upon Johnson's opinion, and specifically asserts that the testing and Zuleger's resulting identification of a major donor from the unknown DNA sample would not be accepted in the scientific community because: (1) the validation study performed by Trinity on the PowerPlex Fusion

---

[9] In labeling the testing in this case as LCN testing Defendant refers to both federal and state cases in which courts have found LCN testing lacking under the appropriate standards to be admissible.  *See e.g.*, *U.S. v. McCluskey*, 954 F. Supp.2d 1224 (D. New Mexico 2013) and *People v. Collins*, 49 Misc.3d 595 (Sup. Ct., Kings Co. 2015).  However, in finding that the disputed DNA evidence in this matter should be admissible, the undersigned is more persuaded by *U.S. v. Morgan*, 53 F. Supp.3d 732 (S.D.N.Y 2014).

kit was inadequate because the study did not include testing involving mixtures of samples from three or more donors; (2) the 210 pg is LCN DNA, and as such the quantitative material is simply too low to obtain reliable test results; and (3) reliance upon the data from the unknown DNA sample was inappropriate given that the major peak heights failed to meet certain standards. In essence, Defendant asserts that for each of these reasons Zuleger's identification of a major donor from the unknown DNA sample is unreliable and should be inadmissible.[10]

First, Defendant asserts that the validation study performed by Trinity on the PowerPlex Fusion kit is inadequate to interpret the data obtained from the unknown DNA sample because the study did not include testing involving mixtures of samples from three or more donors. More specifically, Defendant argues that the protocols derived from the internal validation studies cannot reliably be applied to the unknown DNA sample of three or more donors because the validation studies tested mixtures of only two known DNA samples. Defendant has not presented any challenge to the reliability of Trinity's validation studies, which were done under well-accepted standards. Rather, Defendant simply asserts that since the unknown DNA sample was a mixture of three or more donors, then in order to identify appropriate interpretative guidelines the validation studies should have included tests on samples with a mixture of three or more donors. Contrary to Defendant's argument, Zuleger testified that the same principles and considerations outlined in the validation studies apply whether a mixture is two, three or more donors. The Court accepts Zuleger's position,

---

[10] Notably, as acknowledged by Johnson during cross-examination, Defendant's objection is not with the testing performed by Zuleger. Rather, Defendant's objection is focused solely on Zuleger's interpretation of the data in finding a major donor in the unknown DNA sample collected from the firearm.

especially given that there has been nothing presented to demonstrate that the validation studies' findings would have been different had the studies included testing on mixtures of three or more. It follows that whether Zuleger was analyzing a mixture of two, three, or more donors, the logic is the same, which is that a major donor must show "distinct contrast" in peak heights when compared to minor donors. Govt. Ex. #1 at 99. Thus, the Court finds Defendant's argument regarding Trinity's validation studies on the PowerPlex Fusion kit is an argument that goes to the probativeness of the evidence not to its admissibility. *See Quiet Tech. DC–8, Inc.,* 326 F.3d at 1345.

Next, Defendant argues that the quantitative DNA material tested from the unknown DNA sample was simply too small (210 pg) to obtain reliable results. Both Zuleger and Johnson agreed that 210 pg is below the optimal amount of DNA material, which is 500 pg. However, as Zuleger explained, it is not the numerical quantity of DNA that matters, but the extent of the stochastic effects. In other words, although the presence of stochastic effects may tend to correlate with DNA quantity, it is nonetheless still possible to obtain full DNA profiles from quantitative material less than 200 pg. "Thus, assigning a blanket DNA minimum threshold is misguided when the real interpretive challenge—the presence of stochastic effects—is not perfectly correlated with quantity and can typically be determined by reviewing [the] . . . test results." *U.S. v. Morgan*, 53 F. Supp.3d at 743. In other words, stochastic effects are identifiable and can be appropriately considered by trained forensic biologists under acceptable standards.

Here, both Zuleger and Johnson opined that stochastic effects are present in the data produced from the unknown DNA sample. However, as detailed by Zuleger, because she identified the presence of stochastic effects she proceed more cautiously in interpreting the data

from the unknown DNA sample, and did so by following the interpretation guidelines memorialized from the PowerPlex Fusion validation studies (Def. Ex. #3), along with Trinity's procedures, as outlined in the Manual (Gov. Ex. #1 at 99-102). The Court finds that Zuleger's reliance upon the validation studies and Manual to guide her interpretation was appropriate, given that the validation studies were conducted in accordance with well-known and accepted standards, and the Manual was reviewed and approved during Trinity's accreditation process. Thus, Defendant's argument about the reliability of the quantitative value of the tested DNA (210 pg), also goes to the probativeness of the evidence and not its admissibility because Zuleger based her opinion in interpreting the data to identify a major donor upon accepted and accredited guidelines and procedures. *See Quiet Tech. DC–8, Inc.,* 326 F.3d at 1345.

Last, Defendant asserts that Zuleger's reliance upon the data from the unknown DNA sample was inappropriate given that the major peak heights failed to meet certain standards. In support of this contention, Johnson testified that when considering peak heights the major peaks must be at least two-thirds of the sample, or in other words, the minor peaks must be less than thirty-five percent of the sample. To illustrate this position, Johnson referred to the procedures utilized by the Harris County Institute of Forensic Sciences Crime Laboratory ("Harris County") (Def. Ex. #9) and the California Department of Justice Bureau of Forensic Services ("California") (Def. Ex. # 10). Here, Zuleger relied upon the guidelines from Trinity's validation studies on the PowerPlex Fusion kit that require allele peak heights be above a stochastic threshold level of 400 RFU, and that sister alleles' peak heights be within 60% of each other to be interpreted as a genotype. Notably, the Harris County and California procedures cited by Johnson are procedures from laboratories that went through the same or similar accreditation process as Trinity did. Thus, when considering peak heights, the Harris

14

County and California procedures offer at best an alternative procedure in comparison with the procedures outlined in Trinity's Manual (Govt. Ex. #1) and the validation studies performed by Trinity on the PowerPlex Fusion kit (Def. Ex. #3).  The fact that other accredited laboratories follow different procedures than the accredited procedures and validation studies followed in this case does not go to the admissibility of the DNA evidence, but as with Defendant's other arguments, it may certainly go to the weight of the evidence.  *See Quiet Tech. DC–8, Inc.,* 326 F.3d at 1345.

Undoubtedly, the issues raised by Defendant warrant careful inquiry, especially in light of the undeniable reality that when testing a mixture of three or more donors on a low quantity of DNA (210 pg) there is a heightened awareness of stochastic effects in the data produced from the DNA sample.  The United States' expert, Zuleger, acknowledged a need for caution when interpreting the data from the unknown DNA sample collected from the firearm in this case because of the presence of stochastic effects.  However, the United States has established that Trinity's procedures outlined in the Manual (Govt. Ex. #1) and the guidelines from the validation studies performed on the PowerPlex Fusion kit (Def. Ex. #3), which were relied upon by Zuleger to form her opinions, are scientifically valid and the methodology used by Zuleger to reach her conclusions is sufficiently reliable.  Thus, Defendant's arguments against the disputed DNA evidence go to the weight to be accorded to the evidence, not to its admissibility.

Accordingly, after due consideration and for the foregoing reasons, it is hereby **RECOMMENDED** that Defendant's Motion to Exclude DNA Evidence and Testimony (Dkt. No. 67) be **DENIED**.

**IT IS SO REPORTED** in Tampa, Florida, this 9th day of September, 2016.

_____
ANTHONY E. PORCELLI
United States Magistrate Judge

**NOTICE TO PARTIES**

The parties have until **September 12, 2016**, to file written objections to the Report and Recommendation's factual findings and legal conclusions. A party's failure to file written objections waives that party's right to challenge on appeal any unobjected-to factual finding or legal conclusion the district judge adopts from the Report and Recommendation. *See* 11th Cir. R. 3-1.

Copies furnished to:

Hon. Elizabeth A. Kovachevich
Counsel of Record